Filed 10/21/21 (unmodified opn. attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CENTRAL DELTA WATER AGENCY et al., | C078249 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2010-80000561-CU-WM-GDS) |
| v. | |
| DEPARTMENT OF WATER RESOURCES, | |
| Defendant and Respondent; | ORDER MODIFYING OPINION AND DENYING REHEARING |
| ROLL INTERNATIONAL CORPORATION et al., | |
| Real Parties in Interest and Appellants; | [NO CHANGE IN JUDGMENT] |
| KERN COUNTY WATER AGENCY et al., | |
| Real Parties in Interest and Respondents. | |

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | C080572 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2010-80000561-CU-WM-GDS) |
| v. | |
| DEPARTMENT OF WATER RESOURCES, | |
| Defendant and Respondent. | |

1

| CENTER FOR FOOD SAFETY et al., | C086215 |
| --- | --- |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2016-80002469-CU-WM-GDS) |
| v. | |
| DEPARTMENT OF WATER RESOURCES, | |
| Defendant and Respondent; | |
| DUDLEY RIDGE WATER DISTRICT et al., | |
| Real Parties in Interest and Respondents. | |

THE COURT:

It is ordered that the published opinion filed herein on September 22, 2021, be modified as follows:

1)  On page 6, at the end of the first sentence of the first paragraph, add the words "for oral argument and decision," so that the sentence reads:

    We have consolidated three appeals against respondent Department of Water Resources (DWR) for oral argument and decision.

2)  On page 15, delete the heading "Biological Diversity's Petition and Complaint" and the first paragraph below that heading.

3)  In the first sentence of the last paragraph on page 30, replace the word "validated" with the word "authorized," so that the sentence reads:

    As in the trial court, Central Delta concedes the contracts were authorized, but presents a novel, convoluted argument that the complaint was timely filed.

4)  At the end of the first paragraph on page 48, after the sentence ending "DWR failed to approve or reject the Kern Water Bank transfer," add as footnote No. 7 the following footnote, which will require renumbering of all subsequent footnotes:

Food Safety contends that DWR improperly relied on a prior approval of the Kern Water Bank transfer prior to completion of the Revised EIR in violation of CEQA. We agree with DWR that its decision to continue use and operation of the Kern Water Bank was in compliance with the 2014 Writ. As the trial court ruled: "DWR has done precisely what the 2014 Writ required by determining to 'carry out the proposed project by continuing to the use and operation of the [Kern Water Bank] by [Kern Water Bank Authority].' DWR's project decision was made in conformance with the court's Writ. Thus, the court rejects Petitioners' argument that it was not a valid project 'approval.' "

There is no change in judgment.

The petition for rehearing filed in case Nos. C078249 and C086215 is denied.

BY THE COURT:


_____/s/_____
RAYE, P. J.


_____/s/_____
BLEASE, J.


_____/s/_____
HOCH, J.

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CENTRAL DELTA WATER AGENCY et al., | C078249 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2010-80000561-CU-WM-GDS) |
| v. | |
| DEPARTMENT OF WATER RESOURCES, | |
| Defendant and Respondent; | |
| ROLL INTERNATIONAL CORPORATION et al., | |
| Real Parties in Interest and Appellants; | |
| KERN COUNTY WATER AGENCY et al., | |
| Real Parties in Interest and Respondents. | |

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | C080572 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2010-80000561-CU-WM-GDS) |
| v. | |
| DEPARTMENT OF WATER RESOURCES, | |
| Defendant and Respondent. | |

CENTER FOR FOOD SAFETY et al.,

        Plaintiffs and Appellants,

      v.

DEPARTMENT OF WATER RESOURCES,

        Defendant and Respondent;

DUDLEY RIDGE WATER DISTRICT et al.,

        Real Parties in Interest and Respondents.

C086215

(Super. Ct. No. 34-2016-80002469-CU-WM-GDS)

---

APPEAL from judgments of the Superior Court of Sacramento County, Timothy M. Frawley, Judge. Affirmed.

Law Office of Adam Keats, Adam Keats; John Buse and Aruna Prabhala for Plaintiffs and Appellants in case No. C078249.

April Rose Sommer, John Buse and Nicholas Whipps for Plaintiff and Appellant in case No. C080572.

Law Office of Adam Keats, Adam Keats; Kellan Smith; John Buse and Aruna Prabhala for Plaintiffs and Appellants in case No. C086215.

Nossaman, Stephen N. Roberts, Robert D. Thornton, John J. Flynn III, David Miller; Roll Law Group and Sophie N. Froelich for Real Parties in Interest and Appellants Roll International Corporation, Paramount Farming Company LLC, Westside Mutual Water Company and Tejon Ranch Company in case No. C078249.

Downey Brand, Steven P. Saxton, Kevin M. O'Brien; Young Wooldridge, Steven M. Torigiani and Ernest A. Conant for Real Party in Interest and Appellant Kern Water Bank Authority in case No. C078249.

2

Young Wooldridge, Steven M. Torigiani and Ernest A. Conant for Real Parties in Interest and Appellants Dudley Ridge Water District, Semitropic Water Storage District, Tejon-Castac Water District and Wheeler Ridge-Maricopa Water Storage District in case No. C078249.

Rossmann and Moore, Antonio Rossmann and Roger B. Moore for Planning and Conservation League as Amicus Curiae on behalf of Plaintiffs and Appellants in case No. C078249.

Kamala D. Harris, Xavier Becerra, Rob Bonta, Attorneys General, Robert W. Byrne, Assistant Attorney General, Eric M. Katz, Marilyn H. Levin and Daniel M. Fuchs, Deputy Attorneys General, for Defendant and Respondent.

Kronick, Moskovitz, Tiedemann & Girard, Hanspeter Walter, Daniel J. O'Hanlon and Elizabeth L. Leeper for Real Party in Interest and Respondent Kern County Water Agency in case No. C078249.

Adam C. Kear and Marcia L. Scully for Real Party in Interest and Respondent The Metropolitan Water District of Southern California in case No. C078249.

Redwine and Sherrill, Steven B. Abbott and Julianna K. Tillquist for Real Party in Interest and Respondent Coachella Valley Water District in case No. C078249.

The Law Offices of Young Wooldridge and Steven M. Torigiani for Real Party Interest and Respondent Oak Flat Water District in case No. C078249.

Lemieux & O'Neill, W. Keith Lemieux and Christine M. Carson for Real Parties in Interest and Respondents Littlerock Creek Irrigation District and San Gabriel Valley Municipal Water District in case No. C078249.

Brownstein Hyatt Farber Schreck and Lisabeth D. Rothman for Real Parties in Interest and Respondents Central Coast Water Authority and Santa Barbara County Flood Control and Water Conservation District in case No. C078249.

Somach Simmons & Dunn, Andrew Hitchings and Aaron A. Ferguson for Real Party in Interest and Respondent City of Yuba City in case No. C078249.

Minh Tran, County Counsel, and Robert Martin, Deputy County Counsel, for Real Party in Interest and Respondent Napa County Flood Control and Water Conservation District in case No. C078249.

Brunick, McElhaney & Beckett and Leland McElhaney for Real Party in Interest and Respondent Mojave Water Agency in case No. C078249.

Best Best & Krieger and Kimberly E. Hood for Real Parties in Interest and Respondents Antelope Valley-East Kern Water Agency, Santa Clarita Valley Water Agency, Crestline-Lake Arrowhead Water Agency, Desert Water Agency, and San Gorgonio Pass Water Agency in case No. C078249.

Colleen Carlson, County Counsel, for Real Party in Interest and Respondent County of Kings in case No. C078249.

Anthony T. Fulcher for Real Party in Interest and Respondent Santa Clara Valley Water District in case No. C078249.

Herum/Crabtree/Suntang and Jeanne M. Zolezzi for Real Party in Interest and Respondent Solano County Water Agency in case No. C078249.

Hanson Bridgett and Stephen B. Peck for Real Party in Interest and Respondent Alameda County Water District in case No. C078249.

Downey Brand and David R.E. Aladjem for Real Parties in Interest and Respondents Alameda County Flood Control and Water Conservation District, Zone 7 and San Bernardino Valley Municipal Water District in case No. C078249.

Aleshire & Wynder, Eric L. Dunn and Lindsay M. Tabaian for Real Party in Interest and Respondent Palmdale Water District in case No. C078249.

Nossaman, Stephen N. Roberts, Robert D. Thornton, John J. Flynn III, David Miller; Roll Law Group and Kristina Diaz for Real Parties in Interest and Respondents Roll International Corporation, Roll Law Group PC, Paramount Farming Company LLC and Westside Mutual Water Company in case No. C086215.

Downey Brand, Steven P. Saxton, Kevin M. O'Brien; Young Wooldridge, Steven M. Torigiani and Ernest A. Conant for Real Party in Interest and Respondent Kern Water Bank Authority in case No. C086215.

Young Wooldridge, Steven M. Torigiani and Ernest A. Conant for Real Parties in Interest and Respondents Dudley Ridge Water District, Semitropic Water Storage District, Tejon-Castac Water District and Wheeler Ridge-Maricopa Water Storage District in case No. C086215.

Kronick, Moskovitz, Tiedemann & Girard and Hanspeter Walter for Real Party in Interest and Respondent Kern County Water Agency in case No. C086215.

Adam C. Kear and Marcia L. Scully for Real Party in Interest and Respondent The Metropolitan Water District of Southern California in case No. C086215.

Redwine and Sherrill and Steven B. Abbott for Real Party in Interest and Respondent Coachella Valley Water District in case No. C086215.

Anthony T. Fulcher for Real Party in Interest and Respondent Santa Clara Valley Water District in case No. C086215.

Hanson Bridgett and Nathan A. Metcalf for Real Party in Interest and Respondent Alameda County Water District in case No. C086215.

The Law Offices of Young Wooldridge, Steven M. Torigiani and Brett A. Stroud for Real Party Interest and Respondent Oak Flat Water District in case No. C086215.

Best Best & Krieger, Charity Schiller and Kimberly E. Hood for Real Parties in Interest and Respondents Santa Clarita Valley Water Agency, San Gorgonio Pass Water Agency, Desert Water Agency and Crestline-Lake Arrowhead Water Agency in case No. C086215.

Olivarez Madruga Lemieux O'Neill and Manuel D. Serpa for Real Party in Interest and Respondent Littlerock Creek Irrigation District in case No. C086215.

Brownstein Hyatt Farber Schreck and Amy M. Steinfeld for Real Party in Interest and Respondent Central Coast Water Authority in case No. C086215.

Lagerlof, Senecal, Gosney & Kruse and James D. Ciampa for Real Party in Interest and Respondent San Gabriel Valley Municipal Water District in case No. C086215.

Juliana F. Gmur, Assistant County Counsel, for Real Party in Interest and Respondent County of Kings in case No. C086215.

Ruddell, Stanton, Bixler, Mauritson & Evans and Aubrey A. Mauritson for Real Party in Interest and Respondent Tulare Lake Basin Water Storage District in case No. C086215.

Somach Simmons & Dunn and Aaron A. Ferguson for Real Party in Interest and Respondent City of Yuba City in case No. C086215.

William J. Brunick for Real Parties in Interest and Respondents the Mojave Water Agency and the Antelope Valley-East Kern Water Agency in case No. C086215.

We have consolidated three appeals against respondent Department of Water Resources (DWR). All involve litigation related to changes in long-term water supply contracts brought about by the "Monterey Agreement" and "Monterey Amendment."

In the first case (*Central Delta Water Agency et al. v. Department of Water Resources*, case No. C078249), Central Delta Water Agency, et al. (collectively, Central Delta) appeals from the trial court's decision on a petition for writ of mandate challenging the adequacy of the "Monterey Plus" environmental impact report (Monterey Plus EIR) issued in 2010 and the validity of the Monterey Amendment.

In the second (*Center for Biological Diversity v. Department of Water Resources*, case No. C080572), Center for Biological Diversity (Biological Diversity) appeals from the trial court's denial of attorney fees incurred in connection with its writ petition against DWR involving the Monterey Plus EIR and Monterey Amendment.

In the third case (*Center for Food Safety et al. v. Department of Water Resources*, case No. C086215), Center for Food Safety, et al. (collectively, Food Safety) appeals from the trial court's denial of a petition for writ of mandate challenging DWR's revised environmental impact report on the Monterey Plus project (Revised EIR).

We will affirm in all three cases.

## FACTUAL AND PROCEDURAL BACKGROUND

**State Water Project**

The State Water Project (SWP) and the Central Valley Water Project comprise California's two great water projects aimed at addressing the state's "fundamental water problem."[1] (*El Dorado Irrigation Dist. v. State Water Resources Control Bd.* (2006)

---

[1] The parties in these appeals do not dispute the factual summaries in the trial court's rulings. Indeed, Central Delta and Food Safety direct us to the court's rulings for background history and facts. Therefore, we draw the facts from the rulings below. (*City of Anaheim v. Bosler* (2019) 42 Cal.App.5th 603, 606.)

142 Cal.App.4th 937, 945.) Or, as one court termed it, providing a remedy for the " 'maldistribution' " of water in relation to public needs. (*Ibid*.)

The SWP is one of the largest water projects in the world, consisting of dams, reservoirs, storage tanks, pumping plants, aqueducts, pipelines, and canals designed to capture, store, and deliver water throughout the state. Each year, the SWP delivers water to about 25 million residents from Napa Valley to San Diego and irrigates about 750,000 acres of farmland.

DWR is charged with operating and managing the SWP. During the 1960s, DWR entered into long-term contracts with local and regional water contractors, known as the State Water Project contractors (SWP contractors).

Under the contracts, the SWP contractors received entitlements to an amount of SWP water. Each contract included a "Table A," which specified the maximum amount of SWP water provided to each SWP contractor from the available water during the year. The amount of water available depends on rainfall, snowpack, runoff, reservoir capacity, pumping capacity, and regulatory and environmental restrictions. In return for their entitlements, the SWP contractors committed to pay a proportional share of the costs of developing, operating, and maintaining the SWP. The SWP contractors agreed to make this proportional payment regardless of the amount of available water.

**Articles 18 and 21**

In negotiating the long-term contracts, DWR and the SWP contractors anticipated possible future shortages. The long-term contracts contained provisions regarding a water supply shortage. Article 18, subdivision (a) provided that, in a temporary water supply shortage, agricultural SWP contractors would have their deliveries cut back first— up to 50 percent in a year—before a reduction in deliveries to urban SWP contractors, in what is colloquially referred to as an "urban preference."

Article 18, subdivision (b) addressed a permanent water supply shortage and provided that, with some exceptions, the entitlements of all SWP contractors would be

7

reduced proportionately so that total entitlements would equal the SWP's reduced water supply.

Article 21 dealt with a temporary surplus in available water supply. Under article 21, surplus water would be offered first to agricultural SWP contractors. Article 21, subdivision (g)(1), an amendment to the long-term contracts prior to the Monterey Amendment, provided that DWR " 'shall refuse to deliver such surplus water to any contractor . . . to the extent that the State determines that such delivery would tend to encourage the development of an economy within the area served by such contractor . . . which would be dependent upon the sustained delivery of surplus water.' "

**Kern Water Bank**

The Kern Water Bank is an approximately 20,000-acre groundwater reserve in Kern County. In 1988, DWR acquired the Kern Fan Element as part of a plan to develop the Kern Water Bank. DWR ultimately determined it could not develop a state water bank and, in 1993, ceased work on the project.

**Prelude to the Monterey Agreement**

Application of articles 18 and 21 became a point of contention between the agricultural and urban SWP contractors, as the SWP was unable to deliver sufficient water to satisfy SWP contractor demands on a reliable basis.

During the 1980s, DWR was able to satisfy Table A requests because demands by urban SWP contractors increased more slowly than expected. DWR regularly had surplus water to deliver. Agricultural SWP contractors could schedule delivery of surplus water as much as five years in advance in what was referred to as "scheduled surplus" water.

However, in the late 1980s, SWP contractors were requesting Table A amounts at levels higher than available water such that there was no surplus water to schedule. Since

then, DWR has only delivered "unscheduled surplus" water, which is water that unexpectedly becomes available over what is required to meet Table A demands.

Many of the facilities originally designated to make up the SWP were not completed. When completed, the SWP was expected to deliver about 4.2 million acre-feet of water per year. Failure to complete the facilities resulted in the SWP being unable to deliver all the water to which SWP contractors were entitled under the long-term supply contracts. (*Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 912-913 (*Planning & Conservation*).) DWR estimated the actual, reliable water supply from the SWP to be 2 to 2.5 million acre-feet of water per year. DWR never reduced the original Table A amounts to reflect the deficiency.

A drought in the early 1990s compounded the problem, resulting in even larger disparities between contractual water amounts and those actually delivered.[2] During the drought, DWR relied on article 18, subdivision (a) of the water contracts to reduce significantly amounts delivered to agricultural SWP contractors. However, under article 22, agricultural SWP contractors were required to pay DWR for SWP costs even when they received little or no water. Many agricultural SWP contractors experienced severe financial hardships.

The agricultural SWP contractors believed it was inequitable for DWR to reduce water deliveries under article 18, subdivision (a) because the water shortages were permanent shortages in part because of the failure to complete the facilities necessary to meet the entitlements set forth in Table A. The agricultural SWP contractors believed DWR should declare a permanent shortage and reduce all SWP contractors' annual

---

[2] For example, in 1991, Kern County Water Agency's Table A amount for agriculture was over 1 million acre-feet. DWR was able to deliver only 8,965 acre-feet. The Kern County Water Agency still was contractually obligated to pay DWR more than $37 million.

entitlements under article 18, subdivision (b). Urban SWP contractors disagreed. They believed that DWR should continue to allocate water under article 18, subdivision (a).

**The 1995 Monterey Agreement**

In 1994, DWR and SWP contractor representatives engaged in mediated negotiations in an effort to settle allocation disputes under the long-term water supply contracts. The negotiations soon went beyond articles 18 and 21 into a discussion of revisions to the long-term water supply contracts.

In December 1994, in Monterey, the parties reached a comprehensive agreement known as the Monterey Agreement. The Monterey Agreement established 14 principles designed to resolve water allocation disputes and operational issues of the SWP. These principles can be distilled to three general goals: increase the reliability of existing water supplies, provide stronger financial management of the SWP, and increase water management flexibility.

To implement the Monterey Agreement, the parties drafted an amendment to the long-term water supply contracts. This standard amendment and separate amendments to the long-term contracts became known as the Monterey Amendment.[3]

**The Monterey Amendment**

The Monterey Amendment altered water allocation procedures in times of shortage by eliminating the urban preference and mandating that deliveries to both agricultural and urban SWP contractors would, with exceptions, be reduced proportionately. The amendment also authorized permanent sales of water among contractors and implemented various other changes in administration of the SWP.

---

[3] Appellants in case No. C078249 requested judicial notice of (1) DWR's notice of determination and (2) "Findings and Mitigation Measures, Implementation of the Monterey Agreement Principles," both dated December 13, 1995. They concede that the trial court denied judicial notice of these documents. As this request is thus little more than an attempted end-run around the trial court's decision, we also deny the request.

10

In addition, the Monterey Amendment transferred the 20,000 acres of farmland, the Kern Fan Element, previously considered as the location of the Kern Water Bank, to local Kern County entities so that they could develop the groundwater bank. To accomplish this, the Monterey Amendment added articles 52 and 53 to the long-term water contracts. Article 52 required DWR to convey the Kern property to the Kern County Water Agency in accordance with a separate agreement, entitled the "Agreement for the Exchange of the Kern Fan Element to the Kern Water Bank," known as the "KFE Transfer Agreement." Article 53 provided for the transfer and retirement of 45,000 acre-feet of water entitlements from Kern County Water Agency and Dudley Ridge Water Agency.

The parties also rewrote article 21. As amended, article 21 (1) eliminated scheduled surplus water and gave urban SWP contractors equal access to unscheduled surplus water, and (2) eliminated the language in article 21, subdivision (g)(1) regarding the use of surplus water for permanent economies as unnecessary.

A joint powers agency composed of two SWP contractors prepared an environmental impact report on the agreement (the Monterey Agreement EIR), which DWR, as responsible agency, certified in 1995. The Monterey Amendment was signed by 27 of the 29 SWP contractors between 1995 and 1999. In 1995, the parties executed the KFE Transfer Agreement.

**The Planning and Conservation League Litigation**

In December 1995, a group of plaintiffs, including the Planning and Conservation League (PCL), filed suit challenging the sufficiency of the Monterey Agreement EIR. Among many objections, the PCL plaintiffs argued the Monterey Agreement EIR violated the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) and the contracts were an invalid transfer in violation of the Water Code.

They also alleged DWR, not the two SWP contractors, should have served as the lead agency for purposes of preparing the EIR.

In 1996, the trial court entered an order granting DWR's motion for summary adjudication on the reverse validation cause of action, finding the plaintiffs failed to join Kern County Water Agency as an indispensable party. The court dismissed the reverse validation action. The court subsequently entered a final judgment denying the plaintiffs' application for a writ of mandate to set aside the Monterey Agreement EIR. The court concluded the two SWP contractors were not the proper lead agency under CEQA, but upheld the adequacy of the environmental impact report.

In 2000, we reversed the trial court's judgment in *Planning & Conservation, supra*, 83 Cal.App.4th 892. We found the Monterey Agreement EIR invalid because it was prepared by the wrong lead agency (*id.* at p. 907) and because it failed to discuss implementation of article 18, subdivision (b) as a "no project" alternative (*id.* at pp. 919-920). We found these errors mandated the preparation of a new environmental impact report under the direction of DWR. (*Id.* at p. 926.)

In addition, we held the trial court erred in dismissing the reverse validation challenge to the execution of the Monterey Agreement and the KFE Transfer Agreement for failure to name and serve indispensable parties. (*Planning & Conservation, supra*, 83 Cal.App.4th at p. 926.) We directed the court to vacate its summary adjudication of the reverse validation action, to issue a writ of mandate vacating the certification of the Monterey Agreement EIR, and to retain jurisdiction over the action until DWR, as lead agency, certified the environmental impact report. (*Ibid.*) We declined the PCL plaintiffs' request to set aside approval of the Monterey Amendment and KFE Transfer Agreement.

12

**Settlement Agreement**

The parties engaged in extensive mediated settlement discussions, which led to a comprehensive settlement agreement. Among other things, the settlement agreement provided that the Kern Water Bank Authority, the public entity created to operate the Kern Water Bank, would retain title to the Kern Water Bank and DWR would study its impacts in the Monterey Plus EIR. The parties also agreed that DWR would act as the lead agency in preparing the Monterey Plus EIR.

The settlement agreement required DWR to prepare a new environmental impact report analyzing the Monterey Amendment and the KFE Transfer Agreement and other changes to the long-term contracts. This project was known as the Monterey Plus project because it included the original Monterey Amendment plus the additional terms and conditions of the settlement agreement.

A committee was formed to provide advice and recommendations to DWR in connection with the preparation of the Monterey Plus EIR. The committee, with the PCL representatives actively participating, met formally at least 25 times before DWR issued a draft Monterey Plus EIR in 2007.

In addition, the parties agreed that the Monterey Plus EIR would include analysis of (1) the environmental effects of the pre-Monterey Amendment long-term water supply contracts as part of the no project alternative, (2) the potential environmental impacts of changes in SWP operations and deliveries relating to the implementation of the Monterey Plus project, and (3) an analysis and determination regarding the transfer of development of the Kern Water Bank.

**Monterey Plus EIR**

In 2007, DWR released the draft Monterey Plus EIR. DWR analyzed four no project alternatives, three of which considered the impacts of the SWP operating as if the Monterey Amendment had not been implemented. The fourth no project alternative

13

analyzed the impacts of the Monterey Amendment but without additional terms and conditions of the settlement agreement.

On February 1, 2010, DWR certified the Monterey Plus EIR.  DWR determined the SWP had not caused any significant impacts from 1996 through 2003.  The SWP could result in additional pumping from the Delta in 2003 through 2020, but any impacts on Delta fish would be reduced to a less-than-significant level through compliance with existing and future environmental regulatory processes and permits.  However, the SWP could have potentially significant environmental impacts associated with the construction of new groundwater banking facilities and more severe depletion of two Southern California reservoirs.  The Monterey Plus EIR identified and adopted feasible mitigation measures, but recognized that these measures might not fully mitigate the impacts and adopted a statement of overriding concerns for each impact.

In May 2010, DWR decided to carry out the SWP by continuing to operate under the Monterey Amendment and settlement agreement.  DWR recorded a notice of determination regarding its decision.  The trial court discharged the 2003 writ in August 2010.

**Central Delta Petition and Complaint**

On June 4, 2010, Central Delta filed a first amended petition for writ of mandate and complaint for declaratory and injunctive relief.  The first cause of action challenged the sufficiency of the Monterey Plus EIR.  It alleged the report failed to provide an adequate description of the project and its impacts, did not adequately analyze alternatives and mitigation measures, contained inadequate responses to public comments, and was not circulated properly.  Central Delta also challenged the CEQA findings as not supported by substantial evidence and asserted DWR failed to provide proper notice of determination.

14

The second and third causes of action challenged the validity of the Monterey Plus Amendment. The trial court noted that Central Delta lumped all the various underlying agreements under this term. To avoid confusion, the trial court stated it would refer to the agreements separately as the Monterey Amendment, the KFE Transfer Agreement, and the "Attachment A Amendments." Central Delta mounted challenges to the Monterey Amendment and the KFE Transfer Agreement, which the trial court designated as the "Subject Contracts."

The second cause of action was a reverse validation action, challenging the validity of the KFE Transfer Agreement, as well as the consideration made in exchange for the transfer. Central Delta sought to invalidate the agreement. In the alternative, the third cause of action also challenged the agreement but requested that the court consider a mandamus cause of action if reverse validation did not apply.

**Biological Diversity's Petition and Complaint**

On June 30, 2010, Biological Diversity, along with a coalition of water agencies, nonprofits and individuals, also filed a petition for writ of mandate and complaint for declaratory and injunctive relief. The petition asserted three causes of action. The first arose under CEQA, alleging deficiencies in the Monterey Plus EIR and other CEQA errors. Biological Diversity asserted DWR violated CEQA and requested that the trial court return the Kern Water Bank land to DWR and enjoin the Kern Water Bank's operation. The second and third causes of action arose under the validation statutes, alleging the Monterey Amendment and article 52 were invalid.

Two Kern County water districts, Rosedale-Rio Bravo Water Storage District and Buena Vista Water Storage District (collectively, Rosedale), also filed suit alleging CEQA violations. Their complaint challenged the Monterey Plus EIR's analysis regarding whether the Kern Water Bank adversely affected neighboring groundwater

wells and water banks. Rosedale did not seek to enjoin the operations of the Kern Water Bank or void the land transfer.[4]

**2014 Writ**

The trial court granted DWR's motion to set a special trial on the statute of limitations, laches, and mootness defenses to Central Delta's second and third validation causes of action. In that trial, the trial court found the causes of action time-barred.

Subsequently, the court tried the CEQA claims. The court found no merit in them, save for one. The trial court questioned the adequacy of DWR's analysis of the Kern Water Bank's potential future impact on groundwater and water quality. The parties briefed the issue and the court held another hearing. The trial court concluded that the Monterey Plus EIR should have further analyzed the impacts associated with the Kern Water Bank.

The court issued a ruling on the appropriate remedy and a limited writ of mandate (the 2014 Writ). The 2014 Writ severed the Kern Water Bank operations from DWR operations, ordered DWR to decertify the Monterey Plus EIR, and directed DWR to revise the report only as necessary to address the Kern Water Bank issue.

**Biological Diversity's Motion for Attorney Fees**

On January 23, 2015, Biological Diversity and DWR entered into a stipulation that Biological Diversity could have an extension to file a motion for attorney fees "on or before March 31, 2015." Although there were real parties in interest in the underlying action, neither Biological Diversity nor DWR requested a stipulation from any of them. DWR requested the following stipulation: "DWR contends that Petitioners' Motion for

---

[4] We grant DWR's request for judicial notice, filed July 7, 2016, in case No. C080572, of pleadings or excerpts of pleadings in the Rosedale action. We deny the request for judicial notice of excerpts of briefs filed in case No. C078249, since we have consolidated that case with case No. C080572.

16

Attorneys Fees was required to be filed by or before December 31, 2014, and seeks to preserve its argument that Petitioners' Motion for Attorneys Fees would be untimely if filed on or after the date of this Stipulation." On January 28, 2015, the court issued an order granting the extension of time.

March 31, 2015, was a court holiday, Cesar Chavez Day (Gov. Code, § 19853). Biological Diversity filed its motion for attorney fees on the next business day, April 1, 2015. The motion was filed on behalf of Biological Diversity, California Water Impact Network, California Sportfishing Protection Alliance, and Carolee Krieger. Biological Diversity served as both a party and the legal representative on the motion. The motion requested $1,768,513 in fees for 2,324.3 hours of work.

DWR opposed the motion on several grounds. DWR argued the motion was untimely because it was filed more than 30 days after notice of entry of judgment was served and the amount of fees sought was unreasonable given Biological Diversity's limited success. Each of the real parties in interest joined DWR's opposition. Several real parties in interest also argued that, even if Biological Diversity had filed the fee motion within 60 days after service of notice of entry of judgment, the fee motion was filed late because those real parties in interest had not stipulated to extend the due date.

The court determined the motion was untimely for two reasons: (1) the motion should have been filed within the 30-day statute of limitations applicable to validation causes of action, but Biological Diversity relied on the 60-day limitations period for CEQA causes of action; and (2) the extension of time ordered by the court was inapplicable because not all parties stipulated to the extension.

**The Revised EIR**

DWR prepared the Revised EIR in compliance with the 2014 Writ. The Revised EIR analyzed the Kern Water Bank's potential impact to groundwater wells outside the Kern Water Bank. DWR reviewed Kern County groundwater and consulted with experts, subsequently revising the Kern County groundwater model. The revised model

17

considered impacts from past, existing, and future Kern Water Bank operations in wet, dry, and average rainfall years.

The draft Revised EIR also considered potential impacts of the Kern Water Bank on water quality, air quality, terrestrial species, and greenhouse gases. It also examined potential impacts on these resources in combination with other groundwater banking projects in Kern County.

In April 2016, DWR released the draft Revised EIR. DWR concluded that Kern Water Bank's operations from 1996 through 2014 did not have a significant impact. However, without mitigation, future operation might have significant impacts on surface water and groundwater hydrology and quality, terrestrial biological resources, geology, soils and mineral resources, hazards and hazardous materials, cultural and paleontological resources, energy, and climate change, as well as cumulative impacts related to growth. The draft Revised EIR concluded those impacts would be less than significant after mitigation. The only significant, unavoidable impacts were the Kern Water Bank's facilitation of potential growth-inducing impacts.

The draft Revised EIR identified measures to mitigate the potential impacts to local groundwater wells due to Kern Water Bank's groundwater extraction with the Kern Water Bank Authority adopted in a long-term operations plan. Under the plan, the Kern Water Bank Authority would monitor groundwater levels monthly, publicly report groundwater levels, update the model to project future groundwater conditions, use the model to avoid groundwater recovery activities that could negatively impact well owners, provide equivalent water to the affected well owners, or provide interim in-home water for domestic users. DWR solicited comments on the draft Revised EIR and held two public hearings.

In September 2016, DWR certified the Revised EIR, made findings and determinations, adopted a mitigation monitoring and report program and, as required by

18

the 2014 Writ, directed DWR to carry out the proposed project by continuing the use and operation of the Kern Water Bank by the Kern Water Bank Authority.

DWR adopted a statement of overriding considerations, detailing the Monterey Plus project's benefits, including that "[w]ater supply reliability and equitable allocation among SWP contractors would be facilitated in both wet and dry years, creating significant related statewide benefits for the economy, agriculture, environment and citizens." Restructuring SWP allocations would provide benefits by "eliminating potentially economically devastating agricultural first shortage provisions." DWR found that "[a]gricultural water users would face a lower risk of receiving no water supplies in a dry year while still being required to pay high water contract costs. The lowered risk could keep some lands in agricultural production even in dry years and consequently provide agricultural water users with a baseline of income and reduce their financial loss."

**Judicial Review of Revised EIR**

In September 2016, DWR filed its return to the 2014 Writ. The Central Delta plaintiffs did not object to the discharge of the 2014 Writ, but stated their intent, along with other parties including Food Safety, to file a new suit challenging the Revised EIR. Subsequently, Food Safety and other parties filed a petition for writ of mandate.

Food Safety also filed a motion to stay the case, arguing that the Central Delta appeal automatically stayed further proceedings under Code of Civil Procedure section 916. The trial court found section 916 did not automatically stay its review of the Revised EIR. Central Delta then filed a petition for supersedeas in this court to stay the trial court proceedings, which we denied.

The parties in all cases stipulated the trial court would conduct a single hearing as to whether to discharge the 2014 Writ and on Food Safety's petition challenging the Revised EIR. Following a hearing, in October 2017 the court issued an order discharging the 2014 Writ and denying Food Safety's petition challenging the Revised EIR.

19

## I.    Central Delta Appeal

On appeal from the 2014 Writ, Central Delta contends:  (1) DWR violated CEQA by failing to make a proper project decision; (2) the Monterey Plus EIR failed to analyze article 21, subdivision (g)(1) in the no project alternatives; (3) Central Delta's validation claims are not time-barred; and (4) the trial court was required to order DWR to void its project approvals relating to the Kern Water Bank.

Kern Water Bank Authority, et al. cross-appeal, arguing Central Delta's challenge to the 2010 Monterey Plus EIR is barred by res judicata and Central Delta lacks standing to bring suit.  We affirm the judgment and deny the cross-complaint.

### A.    DWR's Decision on the Monterey Plus EIR

We review an agency's compliance with CEQA under the abuse of discretion standard, i.e., whether the agency has not proceeded in a manner required by law or if its determination is not supported by substantial evidence.  (Pub. Resources Code, § 21168.5; *Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1105-1106.)  Substantial evidence consists of enough relevant information and reasonable inferences from this information to support a conclusion, even though other conclusions might also be reached.  (Cal. Code Regs., tit. 14, § 15384.)[5]

We do not assess the correctness of the environmental impact report's conclusions, but only its sufficiency as an informational document.  We focus on the report's adequacy, completeness, and good faith effort at full disclosure.  (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1390.)  A failure to comply with CEQA requirements that results in omission of information necessary to informed

---

[5]  Regulatory guidelines for CEQA are codified at California Code of Regulations, title 14, section 15000 et seq. (CEQA Guidelines).

decisionmaking and public participation constitutes a prejudicial abuse of discretion, regardless whether a different outcome would have resulted if the agency had complied with the disclosure requirements. (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1198.) We presume DWR's decision to certify the environmental impact report is correct and a challenger bears the burden of proving otherwise. (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 530 (*Sierra Club*).)

Central Delta contends DWR violated CEQA by failing to make a proper project decision. Central Delta maintains that the SWP, for purposes of the Monterey Plus EIR, consisted of the Monterey Amendment and the contract amendments described in the settlement agreement, not the operation of the SWP pursuant to those amendments. According to Central Delta, when DWR made its project decision in the Monterey Plus EIR, DWR failed to decide whether to approve, enact, and adopt the contract amendments.

Central Delta asserts that instead DWR " 'determined that the proposed project [could] be carried out by continuing to operate under the existing Monterey Amendment (including the Kern Water Bank transfer) and the existing Settlement Agreement,' " which " 'does not require re-approval or re-execution of the Monterey Amendment or the Settlement Agreement.' " DWR decided to "continue operating under the Monterey Plus proposed project—the Monterey Amendment and the Settlement Agreement" and directed "the Department to carry out the proposed project by continuing to operate under the existing Monterey Amendment . . . and the existing Settlement Agreement . . . in accordance with the terms of those documents as previously executed . . . ."

DWR argues Central Delta waived this argument by failing to raise it in the trial court. However, Central Delta made a version of the argument in alleging the Monterey Plus EIR violated CEQA by failing to provide an accurate description of the proposed project. As the trial court observed, "Petitioners contend that the EIR's project

21

description is confusing because it is unclear whether the Monterey Agreement is the proposed 'project' or the 'status quo.' Petitioners argue that if the 'no project' alternative is operation of the SWP *without* the Monterey Amendment, then the 'project' necessarily must be operation of the SWP *with* the Monterey Amendment. By describing the Project as 'continuing to operate' under the Monterey Amendment, Petitioners argue that DWR has concealed the true scope of the Project."

As in the trial court, Central Delta contends because the PCL litigation voided the prior approvals of the Monterey Amendment, a new project approval is required. The trial court disagreed.

The trial court found the case before it was "unusual in that the proposed Project is a standardized contract amendment that previously was approved and executed. As part of the Settlement Agreement, the parties agreed that DWR would study and consider the impacts of the changes in SWP operations resulting from implementation of the Monterey Amendment. However, as this court previously concluded, the PCL Litigation did not invalidate the contract amendments. To the contrary, the evidence shows that the parties 'validated' the amended contracts as part of the Settlement Agreement. The parties also affirmed that the SWP would continue to be administered and operated under the Monterey Amendment while a new EIR was being prepared."

Because DWR was operating pursuant to the Monterey Amendment while preparing the Monterey Plus EIR, the trial court found the report accurately described the practical result of carrying out the proposed SWP as "continuing." The Monterey Plus EIR also accurately described the no project alternatives as returning to operation of the SWP in accordance with the pre-Monterey Amendment long-term water supply contracts. As a result DWR did not err in determining it could carry out the SWP "simply by deciding to continue operating under the Monterey Amendment."

On appeal, Central Delta argues that analyzing impacts of a decision that has already been made undermines the effectiveness of an environmental impact report as an

22

informational document.  The trial court agreed in general with this proposition, but found this case presented "a highly unusual situation in which the parties agreed, and the court approved, a 'remedial' EIR to analyze the impacts of the pre-existing contractual amendments."

The court also addressed Central Delta's contention that the trial court in the PCL litigation should have invalidated the Monterey Amendment approvals and the failure to do so undermines CEQA by turning the Monterey Plus EIR into a " 'post hoc rationalization' " to support action already taken.  In a previous ruling, the trial court found the problem with this argument is that even if Central Delta is correct, "[t]he time to object was when the Settlement Agreement was approved and the writ issued, and certainly no later than the discharge of the writ in the PCL Litigation.  Neither Petitioners, nor the PCL plaintiffs, nor any other person raised any objections and, therefore, the PCL writ was issued and discharged and the prior validation action was dismissed and became final."

The trial court concluded that "[t]he unique procedural posture of this case placed the DWR into the unusual position of preparing an EIR for a 'proposed project' that was already approved, implemented, and validated.  The court acknowledges that this is a less-than-ideal way to conduct CEQA review.  Still, the facts are what they are; the court cannot rewrite history.  [¶]  Under the unique circumstances of this case, DWR did not abuse its discretion in describing the Project as continuing to operate under the Monterey Amendment and Settlement Agreement."

On appeal, Central Delta disagrees with the trial court's reasoning.  Central Delta argues the PCL court did not order or authorize DWR to violate CEQA by preparing a purely retrospective environmental impact report.  According to Central Delta, nothing in the record can be read to require or permit DWR "to limit itself to preparing an improper, and ultimately meaningless retrospective analysis of an existing project's environmental impacts."

23

However, CEQA provides a lead agency with discretion as to how it will manifest its decision on a project, "[n]o particular form of approval is required." (*Stockton Citizens for Sensible Planning v. City of Stockton* (2010) 48 Cal.4th 481, 506.) CEQA Guidelines define "approval" as "the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person." (Cal. Code Regs., tit. 14, § 15352, subd. (a).)

Central Delta argues DWR's decision to continue the SWP by relying on its prior approval instead of making a new decision to approve the amendments was not a proper decision under CEQA.

As Central Delta states, CEQA requires that an environmental impact report be completed before a lead agency makes a decision on a project. However, under Public Resources Code section 21168.9, a trial court has the authority to leave earlier project approvals in place while the agency complies with CEQA. Here, the trial court found the PCL trial court allowed the contracts to remain in place while DWR prepared the Monterey Plus EIR. The trial court carefully considered Central Delta's contentions and, after noting the unique procedural and factual circumstances surrounding the litigation, concluded DWR "correctly determined that it could carry out the project simply by deciding to continue operating under the Monterey Amendment." We find the trial court's reasoning persuasive and conclude DWR did not err in its project decision in May 2010.

### B. Article 21, Subdivision (g)(1) and the No Project Alternative

Central Delta next contends the Monterey Plus EIR violates CEQA because the no project alternative improperly failed to include an analysis of the implementation of article 21, subdivision (g)(1), which authorizes DWR to refuse to deliver surplus, which tends to encourage the establishment of a permanent economy. We affirm DWR's

24

decision as to what constitutes the no project condition if we find substantial evidence to support it. (*North Coast Rivers Alliance v. Kawamura* (2015) 243 Cal.App.4th 647, 673.)

Under CEQA, an environmental impact report "describes ways to minimize significant environmental effects, and suggests alternatives to the project, including the option of 'no project.' " (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 113; Cal. Code Regs., tit. 14, § 15126.6, subd. (e)(1) ["The specific alternative of 'no project' shall also be evaluated along with its impact"]; see also *South County Citizens for Smart Growth v. County of Nevada* (2013) 221 Cal.App.4th 316, 330 ["Alternative 1 was the 'No Project' alternative required by CEQA"]; *California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 274.) Under CEQA Guidelines, the no project analysis discusses the existing conditions at the time the notice of preparation is published as well as what would be reasonably expected to occur in the foreseeable future should the project not be approved. (Cal. Code Regs., tit. 14, § 15126.6, subd. (e)(2).) "The existing conditions, supplemented by a reasonable forecast, are characterized as the no project alternative." (*Planning & Conservation, supra*, 83 Cal.App.4th at p. 911.) "[W]here the EIR is reviewing an existing operation or changes to that operation, the no project alternative is the existing operation." (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 234 Cal.App.4th 214, 253.)

The trial court explained that the nature of the SWP as "representing a negotiated compromise between DWR and urban and agricultural contractors – necessarily limits the objectives of the Project. The overall objective of the Project is to resolve the underlying issues that led to the Monterey Amendment and implement the Settlement Agreement."

The court then outlined the specific objectives of the Monterey Amendment: (1) restructure and clarify procedures for water allocation and delivery during times of shortage and surplus; (2) reduce financial pressures on agricultural contractors during drought; (3) adjust the rate structure of the SWP to more closely match revenue needs;

(4) facilitate water management practices and water transfers to improve reliability and flexibility of SWP water supplies in conjunction with local supplies; and (5) resolve legal and institutional issues related to storage of SWP water in Kern County groundwater basins. Each objective corresponded to five elements of the Monterey Amendment: (1) changing allocation procedures for Table A water and surplus water; (2) approval of the permanent transfer of 130,000 acre-feet and retirement of 45,000 acre-feet of Table A amounts; (3) transfer of the Kern Water Bank property; (4) water supply management practices; and (5) restructured rates.

This negotiated compromise resulted in interdependent objectives. Failing to achieve any objective ran the risk of upsetting the negotiated balance of interest reflected in the compromise. The trial court noted that the California Supreme Court in multiple decisions recognized that interdependent objectives may constrain the range of alternatives that can feasibly meet those objectives. The court determined: "Such is the case here. DWR appropriately screened out the various alternatives that would not meet most, if any, of the Project's objectives, including those proposed by the PCL plaintiffs during the EIR Committee process."

DWR analyzed four no project alternatives in the Monterey Plus EIR. To comply with our opinion in *Planning & Conservation*, two of the no project alternatives evaluated the environmental impacts of implementing article 18, subdivision (b). The environmental impact report also analyzed a no project alternative in which article 18, subdivision (b) would not be invoked and a no project alternative in which all of the actions completed under the Monterey Amendment would remain in place. The SWP contractors believed the last alternative was the most realistic because it reflected the conditions existing at the time the notice of preparation was published and did not unwind the actions the SWP contractors believed could not be undone. The trial court found this basic approach to the no project analysis to be reasonable under the circumstances.

26

Central Delta criticized no project alternatives considering article 18, subdivision (b) for failing to analyze that article in combination with article 21. The trial court rejected this criticism: "This is not strictly true. Both alternatives analyzed the implementation of Articles 18 and 21 in tandem. DWR simply did not interpret or apply Article 21 in the same manner as Petitioners."

The Monterey Plus EIR concluded that if article 18 were invoked, it would not have significant impact on the amount of water available to the SWP in any given year. The amount of SWP water available is not generally controlled by the Monterey Amendment, but by a combination of the capacity of DWR's facilities, the hydrologic availability of water, and environmental standards. The court noted these limitations exist independently of the SWP.

The Monterey Plus EIR also concluded that if DWR invoked article 18, subdivision (b) to lower the Table A amounts of water, DWR would use article 21 to continue to try to deliver as much water requested by SWP contractors as possible. Invoking article 18, subdivision (b) would not reduce SWP deliveries, because any decrease in Table A allocations would be counterbalanced by a commensurate increase in article 21 allocations.

In the trial court, Central Delta argued the Monterey Plus EIR relied on two incorrect assumptions: that reductions to maximum Table A amounts do not affect demand and that under article 21, subdivision (g)(1) water could be used to make up the difference. The court dismissed the first contention, but found the Monterey Plus EIR's treatment of article 21 water presented "a more complicated issue."

As the court observed, if article 21, subdivision (g)(1) could be construed in a manner that would result in significant environmental consequences, its elimination should be considered and discussed in the environmental impact report as a no project alternative. Since such an interpretation was plausible, the report should have incorporated the elimination of article 21, subdivision (g)(1) into a no project alternative.

27

The failure to include article 21, subdivision (g)(1) as a no project alternative, however, was reversible only if DWR abused its discretion by failing to include relevant information that precluded informed decisionmaking and informed public participation.

The trial court found the omission of an article 21 no project alternative did not preclude informed decisionmaking or informed public participation, because, in response to comments, DWR developed an analysis of the effects of the SWP operating with article 18, subdivision (b) invoked and limited or no article 21 water delivered to SWP contractors. The analysis provided both the public and the decisionmakers additional information on the effects of not delivering water to SWP contractors that would otherwise be available under article 21.

The court concluded: "The analysis shows that under such a scenario, average annual SWP contractor deliveries would be reduced by about 1.2 [million acre-feet], or about 40%, with potentially significant (adverse and beneficial) impacts. The EIR's analysis of this scenario is not perfect, but it is sufficient to make an informed decision on the Project, particularly where, as here, all of the parties to the SWP contracts believe such interpretation is not reasonable or enforceable."

Central Delta disputes the trial court's conclusion, arguing the court erred in finding DWR's analysis of article 21, subdivision (g) did not preclude informed decisionmaking. We disagree.

As we noted in *Planning & Conservation*, "Our task is extraordinarily limited and our focus is narrow. Did the EIR adequately describe the existing conditions and offer a plausible vision of the foreseeable future?" (*Planning & Conservation, supra*, 83 Cal.App.4th at p. 911.) Central Delta argues our decision in *Planning & Conservation* regarding article 18, subdivision (b) applies just as strongly to DWR's treatment of article 21, subdivision (g)(1) as a no project alternative. (*Planning & Conservation*, at pp. 909-917.) However, the environmental impact report at issue in *Planning & Conservation* did not analyze article 18, but instead ignored the provision. (*Planning & Conservation*, at

p. 913.)  Here, two of the no project alternatives discussed article 21 in relation to article 18, subdivision (b).

Moreover, as the trial court found, DWR included in the final version of the Monterey Plus EIR an analysis of the effects of operating the SWP with article 18, subdivision (b) invoked and with limited or no article 21 surplus water delivered to contractors.  The court concluded that "[t]his analysis provides additional information to the public and to decision-makers on the effects of not delivering water to the SWP contractors that would otherwise be available under Article 21."

As the trial court found, the Monterey Plus EIR's no project analysis and discussion of article 21, subdivision (g)(1) allowed for informed decisionmaking and public participation.  We find no error.

## C.    Reverse Validation Claims

Central Delta challenges the trial court's determination that the validation claims were time-barred.

The validation statute codifies a process by which a public agency knows within a short time period that a matter is valid and immune from subsequent attack.  (Code Civ. Proc., §§ 860-870.5.)  The parties and the trial court agreed that the subject contracts were subject to validation.

A matter may be validated if a public agency files an action to obtain a judicial determination of the matter's validity.  (Code Civ. Proc., § 860.)  A member of the public can file a reverse validation challenge seeking a judicial declaration that a public agency's action is invalid.  (Code Civ. Proc., § 863.)  In both cases, the determination of a validation or reverse validation binds all persons because these actions are in rem. (Code Civ. Proc., §§ 860, 863, 869; *Friedland v. City of Long Beach* (1998) 62 Cal.App.4th 835, 843.)  The immunity from later challenges includes all types of challenges, including those based on common law, statutory, or constitutional challenges.

29

(*California Commerce Casino, Inc. v. Schwarzenegger* (2007) 146 Cal.App.4th 1406, 1420.)

Under Code of Civil Procedure section 860 et seq., an action to challenge the validity of a contract must be commenced within 60 days after the contract comes into existence. Contracts are deemed to come into existence upon their authorization. Contracts are "deemed authorized as of the date of adoption by the governing body of the public agency of a resolution or ordinance approving the contract and authorizing its execution." (Code Civ. Proc., § 864.) If no timely validation action is filed, the matter is conclusively validated. (Code Civ. Proc., §§ 860, 863, 869.)

Here, the trial court considered the applicable statutes and found: "In this case the Subject Contracts are 'contracts' that were 'authorized' by the DWR in 1995 with its approval of the Monterey Agreement, the Monterey Amendment and the KFE Transfer Agreement. In 1996, the PCL Plaintiffs filed a reverse validation lawsuit challenging the validity of those contracts. The Court of Appeal reversed the trial court's dismissal of the validation causes of action and remanded the matter to the trial court. The reverse validation cause of action subsequently was voluntarily dismissed by the PCL Plaintiffs pursuant to the Settlement Agreement. Thus, there can be no dispute that the Monterey Agreement, the Monterey Amendment, and the KFE Transfer Agreement were deemed to be in 'existence,' both by the parties to the PCL Litigation and the Court of Appeal, as early as 1996. [¶] In addition, all of the Subject Contracts, including all 27 of the Monterey Amendments, were fully executed between 1995 and 1999. This further supports the conclusion that the contracts were in 'existence' many years before the Plaintiffs filed this action."

As in the trial court, Central Delta concedes the contracts were validated, but presents a novel, convoluted argument that the complaint was timely filed. Central Delta argues the contracts were taken out of existence in 2003 as part of the settlement agreement. According to Central Delta, as part of the settlement agreement, the trial

30

court "necessarily" voided the 1995 approvals of the Monterey Amendment project, including DWR's authorization of the contracts, and required a new decision on a new project based on a new environmental impact report. Consequently, according to Central Delta, the contracts were not finally approved and authorized until DWR issued its new notice of determination on May 4, 2010.

The trial court disagreed. The settlement agreement resolved the disputes between the PCL parties concerning the Monterey Agreement EIR. The parties came together and drafted the form of the 2003 writ and 2003 order for the court to enter. The trial court found that although DWR agreed to prepare a new environmental impact report and make a new CEQA determination, "nowhere in the Settlement Agreement did the parties agree to invalidate the Subject Contracts."

As the trial court noted, the settlement agreement explicitly required DWR to set aside its certification of the Monterey Agreement EIR, but did not mention setting aside the contracts. We agree with the trial court's conclusion that, "[i]n the absence of any language in the Settlement Agreement, Interim Implementation Order or the PCL writ requiring the DWR to set aside its approval of the Subject Contracts, it simply cannot be inferred that the parties or the trial court intended this result." We also agree with the trial court that, for the same reasons, DWR's issuance of the new environmental impact report and the issuance of the notice of determination did not cause the contracts to go out of existence and create a new contract subject to validation.

In addition, the trial court noted the PCL plaintiffs agreed to dismiss their reverse validation challenge to the Monterey Amendment, subject to a tolling agreement. As the trial court observed, "[t]his is clear evidence that the parties intended to 'validate' those Contracts as part of the Settlement Agreement."

The trial court also found extrinsic evidence to support its conclusion that the contract approvals were not invalidated. The parties to the settlement agreement issued a joint statement listing the " 'key components' of the agreement. If invalidation of the

31

Monterey Amendment had been agreed to, one would reasonably expect it to be included as a 'key component' of the agreement. It was not. In contrast, the Joint Statement explicitly stated that the Kern Water Bank would 'remain in local ownership' and continue to be operated 'as it has,' subject to additional restrictions on use."

The trial court also noted that the PCL defendants informed the mediator before executing the settlement agreement that they would "never" agree to a writ that required DWR to set aside project approvals. The trial court concluded: "If the writ were intended to vacate all project approvals, the PCL Plaintiffs and the trial court certainly knew how to include such language in the writ. Because they did not, the Court is bound to conclude that there was no intent to vacate the project approvals."

As in the trial court, Central Delta argues that even if the PCL parties did not intend the settlement agreement to take the contracts out of existence, the plain meaning of the 2003 order and 2003 writ did so. Central Delta cites the 2003 order's language ordering that "[i]n the interim, until DWR files its return in compliance with the [2003 writ] and this Court orders discharge of the [2003 writ], the administration and operation of the State Water Project and Kern Water Bank Lands shall be conducted pursuant to [the contracts]."

Central Delta argues such "interim" authorization would have been unnecessary if the parties had agreed to fully validate the contracts. Therefore, the use of the term " 'interim' " shows the parties intended to set aside the original approvals of the projects and require DWR to make a new determination.

The trial court noted Central Delta was confusing the CEQA project with the underlying agreements. In addition, the court found "the more reasonable interpretation of the term 'interim' is that the parties needed to account for the fact that, under the Settlement Agreement, the PCL Plaintiffs retained a conditional right to re-file their challenge to the validity of the Subject Contracts. The PCL Plaintiffs agreed to dismiss their validation causes of action 'without prejudice,' and agreed not to re-file only so long

32

as certain conditions were met.  The parties explicitly agreed to toll the statute of limitations relating to the validation cause of action *for the PCL Plaintiffs* until forty-five days after the filing of the Notice of Determination on the new EIR."  The court concluded that the "inclusion of the tolling agreement" supported its interpretation "since it shows the parties intended the contracts be 'validated,' subject only to the possibility that the PCL Plaintiffs might re-file their validation action if certain agreed-upon conditions were not met."  We agree with the trial court's analysis.

For the first time on appeal, Central Delta argues DWR's 2003 amendment to the long-term contracts, the Attachment A Amendments, reauthorized the Monterey Amendment and that reauthorization took place on May 5, 2010.  In the settlement agreement, DWR and SWP contractors agreed to amend the contracts to redefine several terms, including changing " 'annual entitlement' " to " 'Annual Table A Amount.' "  The changes were "solely for clarification purposes, and are not intended to nor do they in any way change the rights, obligations or limitations on liability of the State or the District."  The Attachment A Amendments were to be signed within 60 days of the settlement agreement's effective date and therefore were authorized when DWR and SWP contractors signed them in 2003.  The amendments would be effective on an interim basis upon execution and would become final at the conclusion of the litigation surrounding the validity of the Monterey Agreement.

Central Delta contends DWR's adoption of the Attachment A Amendments in 2003 operated as a reauthorization, on an interim basis, of the Monterey Amendment. The reauthorization of a contract makes the entire contract, including the amended portions, subject to a validation challenge.  In support, Central Delta relies on *Barratt American, Inc. v. City of Rancho Cucamonga* (2005) 37 Cal.4th 685 (*Barratt*).

In *Barratt*, the California Supreme Court considered a city's annual adoption of a development fee ordinance under Government Code section 66022.  Under the statute, a city can charge development fees only as necessary to cover the cost of the service

33

provided. (Gov. Code, § 66014, subd. (a); *Barratt, supra*, 37 Cal.4th at p. 691.) If the fees charged developers in one year create excess revenue, the city must lower fees the following year to make up for the previous overcharge. (Gov. Code, § 66016, subd. (a); *Barratt*, at p. 703.) Government Code section 66022 allows validation challenges to "an ordinance, resolution, or motion adopting a new fee or service charge, or modifying or amending an existing fee or service charge." (Gov. Code, §66022, subd. (a).)

The court in *Barratt* concluded that the city's fee ordinance requires an annual accounting and an independent decision each year that the prior year's fees did not result in a surplus and that the present year's fee schedule is set at a level designed to cover only the cost of service. Even if the city readopts the previous year's fee schedule without change, the court found the city would be making a new determination, based on new data that the previous year's fees did not result in a surplus. Under these facts, each year the city's fee ordinance decision is subject to challenge under the validation statute. (*Barratt, supra*, 37 Cal.4th at pp. 703-704.)

Central Delta contends that "just as the reenactment rule of statutory interpretation states that the enactment of an amendment to a statute reenacts the entire statute, so must the authorization of a contract amendment reauthorize the entire contract; the contract must be 'deemed to have been acted on as a whole' at the date of the authorization of the amendment. ([*Barratt*]*, supra*, 37 Cal.4th at [p.] 704.)" However, Central Delta provides no support for the sweeping proposition that an analysis of statutory interpretation applies with equal force to contracts.

Here, DWR's decision in May 2010 to continue with the Attachment A Amendments was not a reauthorization of the Monterey Amendment, which had been executed years earlier. Although some of the settlement agreement obligations do not become final until the Monterey Amendment litigation is concluded, this does not support a finding that the Attachment A Amendments constituted a reauthorization of the Monterey Amendment. Neither the settlement agreement nor the Attachment A

Amendments provide any support for the argument that the Attachment A Amendments reauthorize the Monterey Amendment.

### D. Issuance of Limited Writ

Finally, Central Delta asserts the trial court abused its discretion by issuing a limited CEQA remedy. The trial court found in favor of Central Delta's claim that DWR's discussion of the potential impacts associated with the future use and operation of the Kern Water Bank was inadequate. After briefing and a hearing on the appropriate CEQA remedy for the violation, the trial court issued findings and a writ of mandate.

The trial court found that the CEQA error was limited to the potential impacts from the Kern Water Bank operations and determined that portion of the environmental impact report could be severed from the rest of the SWP. The court ordered DWR to revise the Monterey Plus EIR to correct the deficiency and to "make a new determination regarding whether to continue the use and operation of the Kern Water Bank by [Kern Water Bank Authority]." In addition, the court allowed DWR to continue operating the SWP pursuant to the contracts and allowed the authority to continue operating the Kern Water Bank while DWR revised the Monterey Plus EIR.

Faced with Central Delta's objections, the trial court noted Central Delta's broad challenges to the sufficiency of the Monterey Plus EIR and that the court had rejected all but one of these arguments. Therefore, "[t]he court has since concluded that it is appropriate for the court to limit its remedy to the Kern Water Bank portion of the Project. As a result, the only 'approvals' reasonably at issue here are the approvals to continue using and operating the Kern Water Bank. [¶] Invalidating the Project approvals is unnecessary and would throw the entire SWP into complete disarray, smack in the middle of one of the most severe droughts on record. The circumstances of this case do not warrant that degree of judicial intervention, especially where, as here, the SWP has been operating under such approvals for years while DWR prepared the EIR."

35

CEQA, through the Public Resources Code, allows a trial court to leave project approvals in place. After a court finds a CEQA error, the court has three options: void a decision in whole or part; suspend certain project activities; or take other specified actions. (Pub. Resources Code, § 21168.9, subd. (a).) CEQA does not require the court, on finding CEQA error, to void all project approvals. The plain language of section 21168.9 grants the trial court the discretion to leave project approvals in place. (*Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 286-290.) Here, the trial court invoked Public Resources Code section 21168.9 in its ruling.

Central Delta argues the trial court did not have discretion to leave project approvals in place after finding the Monterey Plus EIR was deficient in its analysis of the transfer, use, and operation of the Kern Water Bank. According to Central Delta, a writ must void any approvals that commit an agency to a definite course of action that has not been subject to proper environmental review, citing *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116 (*Save Tara*).

However, in *Save Tara* the lead agency approved an agreement allowing private development without preparing an environmental impact report. The Supreme Court held a report was required and under these circumstances ordered the underlying project approvals voided. (*Save Tara, supra*, 45 Cal.4th at pp. 121, 143.) The court did not consider the trial court's discretion to leave project approvals in place after an environmental impact report is prepared and the court finds some defects in the report. Here, the trial court exercised its discretion under Public Resources Code section 21168.9 and we find no abuse of that discretion.

### E. Kern Water Bank Parties' Cross-Appeal

The Kern Water Bank parties (KWB parties) countered Central Delta's petition and complaint with a motion for judgment on the pleadings, arguing Central Delta's

36

challenge to the Monterey Plus EIR was barred because the trial court's order discharging the 2003 writ was res judicata to their allegations.

The KWB parties' motion was filed in June 2011. The court denied the motion. During the trial on the CEQA causes of action, the KWB parties renewed their claim that Central Delta's first CEQA cause of action was barred by res judicata. The trial court again rejected the argument. Following entry of judgment, the KWB parties filed a notice of cross-appeal.

Whether the doctrine of res judicata applies to bar a cause of action is a question of law we review de novo. (*City of Oakland v. Oakland Police & Fire Retirement System* (2014) 224 Cal.App.4th 210, 228.) Res judicata, or claim preclusion, precludes parties or their privies from relitigating a cause of action finally resolved in a prior proceeding. Collateral estoppel precludes relitigation of issues argued and decided in a prior proceeding. (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896-897.)

Res judicata applies when a party can demonstrate: (1) the decision in the prior proceeding is final and on the merits; (2) the present proceeding is on the same cause of action as the prior proceeding; and (3) the parties in the present proceeding or parties in privity with them were parties to the prior proceeding. If a party satisfies these requirements, claim preclusion bars not only issues that were actually litigated, but also issues that could have been litigated. (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1202.)

As the trial court noted, Central Delta did not dispute that the August 30, 2010 order discharging the writ of mandate is a decision both final and on the merits. However, both on appeal and in the trial court, Central Delta argues that the order did not determine the merits of the Monterey Plus EIR's compliance with CEQA. Because the Monterey Agreement EIR and the Monterey Plus EIR are factually distinct attempts to satisfy CEQA, Central Delta contends its challenge to the latter involves a different cause of action.

37

The KWB parties argue the PCL lawsuit alleged DWR had "failed to act and will continue to fail to act to operate and manage the California Water Project . . . in violation of CEQA." The 2003 writ required DWR to prepare and certify an environmental impact report that complies with CEQA. The trial court issued a final judgment that the Monterey Plus EIR, prepared and certified by DWR, addressed the primary right injury identified in the 2003 writ and, with the concurrence of the PCL plaintiffs, discharged the 2003 writ. The judgment states: "The Court finds that Defendants . . . have fully complied with the terms of the Peremptory Writ of Mandate issued on May 20, 2003 in the above-entitled case." Therefore, the KWB Parties contend, "the judgment fully and finally adjudicated the 'primary right' here – that the 2010 EIR comply with CEQA."

However, the trial court agreed with Central Delta, as do we, that the order discharging the writ in the PCL litigation does not bar Central Delta's CEQA cause of action.

Courts employ the primary right theory in defining a cause of action for the purposes of res judicata. Under the primary right theory, a cause of action consists of a primary right possessed by the plaintiff, a corresponding primary duty owed by the defendant, and a breach by the defendant of the primary right and duty. Each invasion of a primary right gives rise to only one cause of action, even if multiple theories of recovery are asserted. As a result, two proceedings are based on the same cause of action if they are based on the same primary right. (*Citizens for Open Access etc. Tide, Inc. v. Seadrift Assn.* (1998) 60 Cal.App.4th 1053, 1067 (*Citizens for Open Access*).)

A plaintiff's primary right is the right to be free from a particular injury, regardless of the legal theory on which liability for the injury is based. The scope of the primary right depends on how the injury is defined. An injury is defined to some degree by reference to the set of facts from which the injury arose. (*Silverado Modjeska Recreation & Park Dist. v. County of Orange* (2011) 197 Cal.App.4th 282, 297-298 (*Silverado*).)

38

In a CEQA proceeding, a plaintiff's right to ensure the lead agency's compliance with CEQA's substantive and procedural requirements with respect to a particular environmental impact is a primary right. (*Silverado, supra*, 197 Cal.App.4th at p. 298.) Here, the trial court found: "It is well settled that the court which issues a writ of mandate retains jurisdiction to enforce the writ until it is fully satisfied. If, after an agency has filed its return to the writ, the petitioner is not satisfied that the court's mandate has been carried out, the petitioner may challenge the validity of that claim by filing a new or supplemental petition, which may (and likely will) involve new and different causes of action. It is certainly conceivable, therefore, that a judgment adjudicating such a petition may bar subsequent challenges asserting similar claims. [Citation.] [¶] But that is not this case. The PCL Plaintiffs did not file a new or supplemental petition challenging DWR's return to the writ. Neither did they object to the return. Rather, they filed a 'Consent to Entry of Order Discharging the Writ.' As a result, the only cause of action at issue in the PCL Litigation was that framed by the PCL Plaintiffs' complaint. [Citations.] Because the underlying cause of action in this case is different from the cause of action litigated in the PCL Litigation, the underlying cause of action is not barred by res judicata. [Fn. omitted.]"

The trial court relied on *Planning & Conservation League v. Castaic Lake Water Agency* (2009) 180 Cal.App.4th 210, 228 (*Castaic Lake*). In *Castaic Lake*, two proceedings involved "distinct episodes of purported noncompliance regarding 'the same general subject matter' [citation], namely, the public's statutory right to an adequate EIR . . . ." (*Id.* at p. 228.) Here, Central Delta challenges deficiencies in the Monterey Plus EIR, which the PCL plaintiffs could not have challenged in their 1995 petition for writ of mandate. After ruling for the PCL plaintiffs, the trial court issued a writ of mandate ordering decertification of the Monterey Agreement EIR and preparation of a new environmental impact report by a different agency. We agree with the trial court that the

39

PCL litigation and the current litigation address different reports and "are factually distinct attempts to satisfy CEQA's mandates."

However, this did not end the trial court's analysis. The court also considered whether Central Delta was collaterally estopped from pursuing the issues raised on appeal.

Collateral estoppel applies when: (1) the issue sought to be precluded is identical to that decided in a prior proceeding; (2) the issue was actually litigated and necessarily decided in the prior proceeding; (3) the decision in the prior proceeding is final and on the merits; and (4) the party against whom issue preclusion is asserted is the same or in privity with the party in the prior proceeding. (*Hernandez v. City of Pomona* (2009) 46 Cal.4th 501, 511.)

The KWB parties argue the order discharging the writ was a complete adjudication of the issues Central Delta sought to litigate. "According to Movants, the order represents an adjudication that DWR has fully complied with CEQA, not just with respect to the issues litigated in the prior proceeding, but also in respect to any new challenges that could be raised in respect to the 2010 EIR."

The trial court found some support for KWB parties' argument, noting that one aim of the settlement agreement was to establish a procedure to litigate and decide all alleged deficiencies of the Monterey Plus EIR as part of filing the return to the writ. In deciding the motion to discharge the writ, the court adjudicated DWR's compliance with the writ's directives. Since the writ directed DWR to comply with CEQA, the court's ruling that DWR complied with the writ "arguably reflects, at least to some extent, a determination of the lead agency's compliance with CEQA in preparing and certifying an EIR for the project."

However, collateral estoppel requires that the same precise issue was actually litigated and determined in the first action. As the trial court noted: "Here, the trial court unequivocally decided that DWR has complied with CEQA with respect to the issues

40

alleged in the prior action, but it is unclear whether the trial court necessarily decided that the 2010 EIR fully complies with CEQA in all other respects." Although the court found it a close question, the court concluded collateral estoppel does not apply because the KWB parties failed to establish the issues were actually litigated and decided in the prior proceeding. We agree with the trial court's analysis.

The court also found the KWB parties could not establish privity between the parties. Privity for collateral estoppel and res judicata purposes refers to a relationship between the party to be estopped and the unsuccessful party in the prior litigation sufficiently close to justify application of the doctrine of res judicata. The determination of privity depends on the fairness of binding one party with the result from an earlier proceeding in which it did not participate. Such a determination requires a close examination of the circumstances. The nonparty must have had an identity or community of interest with, and adequate representation by, the party in the first action, so that the nonparty should have expected to be bound by the prior adjudication. (*Citizens for Open Access, supra*, 60 Cal.App.4th at pp. 1069-1070.)

In CEQA cases, litigation of CEQA claims against a defendant on behalf of the public is generally sufficient to support a finding of common interest to establish privity. (*Silverado, supra*, 197 Cal.App.4th at p. 299.) Here, both the PCL plaintiffs and Central Delta pursued their CEQA challenges on behalf of the public. As the trial court acknowledged, even though they asserted different causes of action, both litigations sought relief on behalf of the public impacted by the environmental concerns. This was sufficient to show a common interest in the enforcement of CEQA.

Since Central Delta shared a community of interest with the PCL plaintiffs, the trial court next considered whether their interests were adequately represented in the prior action. The question of whether a party was adequately represented turns on whether the party to the earlier action had adequate opportunity and incentive to litigate the common issues. If the party to the earlier action had no opportunity or incentive to assert the

41

common interest, we cannot infer adequate representation and no privity exists. Conversely, if the party had the opportunity to litigate the same issues in the earlier proceeding, and was equally motivated to reach a successful conclusion, we may infer adequate representation. In addition, we may also consider the manner in which the party participated in the earlier action. (*Citizens for Open Access, supra*, 60 Cal.App.4th at pp. 1072-1073.)

The trial court noted courts have come to different conclusions in assessing a party's participation in the earlier action. In some cases courts found privity established because the prior litigant actively participated in the litigation and zealously asserted the common interest. (*Citizens for Open Access, supra*, 60 Cal.App.4th at pp. 1072-1073; *Mooney v. Caspari* (2006) 138 Cal.App.4th 704, 719-720.) However, in *Castaic Lake, supra*, 180 Cal.App.4th 210, the court overruled a demurrer based on res judicata because the plaintiff in an earlier action expressly relinquished its role and dismissed its case due to a lack of funds. (*Id.* at pp. 231-232.) The trial court found *Castaic Lake* bore similarities to the facts in the present case.

In *Castaic Lake*, the plaintiff had successfully challenged an environmental impact report and then voluntarily dismissed its action with prejudice after the agency filed a return to the writ and a new report. The plaintiff asserted the new report was also defective but acknowledged it lacked the funds to continue the challenge. Subsequent plaintiffs filed challenges to the new environmental impact report and the agency filed a demurrer arguing the challenges were barred by res judicata. The trial court overruled the demurrer, finding the plaintiffs were not barred by res judicata. The appellate court agreed that the statements made by the original plaintiff in dismissing the prior action revealed an " 'abdication of the role of public agent' " and an "abandonment" of any intention to represent the interests of the general public in the litigation. (*Castaic Lake, supra*, 180 Cal.App.4th at p. 231.) In view of these statements, the court said, "we cannot infer that the parties are in privity." (*Ibid.*)

42

The trial court here noted the PCL plaintiffs also brought their challenge to the 1995 Monterey Agreement EIR on behalf of the public "but then expressly disavowed and abandoned their role as public agent in the Consent to Discharge."

Central Delta argued the PCL plaintiffs did not adequately represent the public interest in the order discharging the writ. Central Delta cited the terms of the settlement agreement, which prevented PCL plaintiffs from challenging the Monterey Plus EIR without first submitting to a long, complicated mediation process. The KWB parties countered that the PCL plaintiffs participation in the settlement agreement and in the lengthy process for preparation of the Monterey Plus EIR confirms that the PCL plaintiffs continued to represent public interests throughout the PCL litigation.

The trial court found the KWB parties' argument presented a factual question which could not be resolved by a motion for judgment on the pleadings. "Since the PCL Plaintiffs' statements in the Consent to Discharge express an intent to relinquish their role as a public representative, the Court cannot for purposes of this motion for judgment on the pleadings infer that the parties are in privity." Accordingly, the court denied the motion.

On appeal, the KWB parties argue the privity requirement is easily satisfied because of the public interest nature of the CEQA claims prosecuted by the PCL plaintiffs. According to the KWB parties: "The *PCL* Plaintiffs and the Central Delta Appellants here clearly have an identity of interest regarding CEQA enforcement sufficient to establish privity. Both consist of nonprofit environmental organizations and other public entities alleging that their primary interest is to ensure that DWR complied with CEQA regarding the Monterey Amendments. Because the Central Delta Appellants here and the *PCL* Plaintiffs pursued claims on behalf of the public, that fact alone is sufficient to show a 'common interest' in the enforcement of CEQA for purposes of a privity determination."

The KWB parties also argue the present situation "differs dramatically" from that in *Castaic Lake*. In *Castaic Lake* the previous plaintiff dismissed its action and stated it could no longer act in a representative capacity. In contrast, the KWB parties contend, the PCL plaintiffs never abandoned their representation of the public interest and obtained the settlement agreement, which bound DWR to review and dispute resolution for preparation of the 2010 Monterey Plus EIR. "Only at the conclusion of this lengthy process did the *PCL* Plaintiffs consent to DWR's return to the 2003 Writ."

However, as the trial court found, the PCL plaintiffs expressly disavowed and abandoned their role as public agent in the consent to discharge. The PCL plaintiffs stated they "disavow[ed] any intent to act as representative of any others with respect to DWR's certification of the 2010 Monterey Plus EIR approval of the Monterey Plus project." We examine the record for "even the hint of any abdication of the role of public agent by the parties to the prior litigation" when determining whether privity exists between the parties. (*Citizens for Open Access, supra*, 60 Cal.App.4th at p. 1072.) Based on the record in the PCL litigation, we cannot find privity existed between the parties.[6]

## II.      Biological Diversity's Appeal

Biological Diversity appeals only from trial court's order denying its motion for attorney fees as untimely.

---

[6] Additionally, the KWB parties argue Biological Diversity did not have standing to maintain a CEQA cause of action because it failed to timely object to DWR's action on the Monterey Plus project. The trial court found Biological Diversity timely objected to the SWP prior to the close of the public hearing on the project. Biological Diversity submitted its comments before SWP contractors provided their final comments on the environmental impact report, before the environmental impact report committee completed its process, and before DWR completed its review of the final environmental impact report. We agree with the trial court's finding that Biological Diversity did not lack standing.

The trial court's order is presumed correct and Biological Diversity bears the burden of showing error. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1140-1141.) We conduct a de novo review of a trial court's interpretation of the California Rules of Court. (*Mercury Interactive Corp. v. Klein* (2007) 158 Cal.App.4th 60, 81.)

Biological Diversity seeks attorney fees pursuant to Code of Civil Procedure section 1021.5, which provides an exception to the rule that each party is responsible for its own attorney fees. A court may award fees under this statute if: (1) the action has resulted in the enforcement of an important public right affecting the public interest; (2) a significant benefit has been conferred on the general public or a large class of persons; and (3) the necessity and financial burden of private enforcement are such as to make the award appropriate. (*Azure Ltd. v. I-Flow Corp.* (2012) 207 Cal.App.4th 60, 66-67.)

Biological Diversity argues it was entitled to an award of reasonable attorney fees because it was a successful party that enforced an important public right affecting the public interest, conferred a significant public benefit, and the costs of its legal victory transcended any personal interest in the lawsuit. DWR counters the motion was untimely because it was not filed within 30 days of service of the notice of entry of judgment as required by Code of Civil Procedure section 870, subdivision (b).

The trial court found Biological Diversity's motion for attorney fees untimely. We agree.

The California Rules of Court provide that a motion for attorney fees "must be served and filed within the time for filing a notice of appeal under rules 8.104 and 8.108 in an unlimited civil case . . . ." (Cal. Rules of Court, rule 3.1702(b)(1).) Under rule 8.104, unless a statute or rule provides otherwise, the deadline for filing a notice of appeal ordinarily is 60 days after service of notice of entry of judgment, or 180 days after entry of judgment, whichever is first. (Cal. Rules of Court, rule 8.104(a).)

In a validation action, Code of Civil Procedure section 870, subdivision (b) provides: "Notwithstanding any other provision of law . . . no appeal shall be allowed

45

from any judgment entered into pursuant to this chapter unless a notice of appeal is filed within 30 days after the notice of entry of judgment . . . ." The 30-day deadline to file notice of appeal of judgment of validation judgments is broadly construed. (*Planning & Conservation League v. Department of Water Resources* (1998) 17 Cal.4th 264, 273-274.)

Here, as the trial court noted, Biological Diversity's complaint included a reverse validation cause of action, i.e., the second cause of action was brought under the validation statutes. Biological Diversity requested that the trial court find the contracts at issue invalid. The trial court found, as Biological Diversity stipulated, that the Monterey Amendment was a contract subject to the validation statutes. The trial court's judgment expressly stated that it resolved a claim brought under the validation statutes. On the validation claim, the court entered judgment in favor of DWR and real parties in interest.

Notice of entry of judgment was served on December 1, 2014. Under Code of Civil Procedure section 870, the last day for Biological Diversity to file a notice of appeal from judgment was December 31, 2014. (Code Civ. Proc., § 870, subd. (b); Cal. Rules of Court, rule 8.104(a); *California Commerce Casino, supra*, 146 Cal.App.4th at p. 1419.) Under rule 3.1702(b)(1) of the California Rules of Court, the same deadline applied to an attorney fees motion. Biological Diversity filed a notice of appeal on December 30, 2014, but did not file a motion for attorney fees until April 1, 2015.

In the trial court, as on appeal, Biological Diversity argued it sought only attorney fees on its successful CEQA cause of action, not the reverse validation claim. Therefore, the relevant deadline should be the time to file a notice of appeal on the CEQA cause of action, the standard 60-day limit under California Rules of Court, rule 8.104.

The court disagreed, finding: "In the court's view, there was a single deadline to appeal the Judgment, not multiple deadlines tied to the various causes of action decided in the Judgment. [¶] Here, the deadline to file a notice of appeal was shortened because the Judgment included a validation cause of action. Petitioners apparently were aware of

46

this since they filed their notice of appeal within the shortened deadline.  Petitioners did not file their motion for attorney fees until 90 days later.  Thus, the motion is untimely."

We agree with the trial court's assessment.  Biological Diversity attempts to divide the trial court's judgment into separate causes of action, each with a different due date for a notice of appeal and for a motion for attorney fees.  However, an appellant appeals from a final judgment, not each cause of action.  (*Laraway v. Pasadena Unified School Dist.* (2002) 98 Cal.App.4th 579, 583.)  "[T]he one final judgment rule does not permit parties to 'separate [their] causes of action into two components for separate appellate treatment at different points in time.' "  (*Kurwa v. Kislinger* (2013) 57 Cal.4th 1097, 1107.)

We find Biological Diversity's citations to case authority unpersuasive.  In *Santa Clarita Organization for Planning & the Environment v. Abercrombie* (2015) 240 Cal.App.4th 300, the appellate court found that although the plaintiffs characterized their complaint as a reverse validation action, the facts did not support the claim. Therefore, the validation statutes' shorter time limit for filing a notice of appeal did not apply.  *Abercrombie* states that if there is an issue as to whether an action is subject to the validation statutes, the court must ascertain whether the underlying facts constitute a validation proceeding, thereby invoking the 30-day rule.  (*Id.* at p. 308.)  Similarly, in *Kaatz v. City of Seaside* (2006) 143 Cal.App.4th 13, the court also considered whether the underlying complaint raised a claim under the validation statute.  (*Id.* at pp. 19, 27.)

Biological Diversity argues that "[t]he trial court had a duty to analyze the underlying claims to determine the appropriate deadline for the attorney's fee motion and it failed that duty."  However, neither *Abercrombie* nor *Katz* support this broad claim. Here, the trial court was aware Biological Diversity was seeking attorney fees for its success on the CEQA cause of action, but found the validation cause of action in the judgment invoked the shorter deadline for filing both the appeal, which was filed on time, and for filing a motion for attorney fees, which was not.  We find no error.

### III. Food Safety's Appeal

Food Safety challenges DWR's Revised EIR, arguing: (1) the trial court lacked jurisdiction; (2) the Revised EIR inadequately addressed the Kern Water Bank's contribution to crop conversion; (3) the Revised EIR should have included a no project alternative that assumed little or no delivery of surplus water; and (4) DWR failed to approve or reject the Kern Water Bank transfer.

We affirm the judgment.

### A. Trial Court Erred in Not Staying Claims

Food Safety argues Code of Civil Procedure section 916 automatically stayed the trial court's consideration of Food Safety's challenge to the Revised EIR because the prior litigation involving the Monterey Plus EIR discussed above sought some of the same remedies. A few months after filing this action, Food Safety filed a motion in the trial court for stay of proceedings pursuant to Code of Civil Procedure section 916, subdivision (a). After a hearing on the motion, the trial court found this statute did not automatically stay its review of the Revised EIR. The trial court denied the motion.[7]

On appeal, Food Safety argues the proceedings before the trial court should have been stayed, rather than the petition denied and the writ discharged, due to issues in two claims being embraced in a related appeal. The present case has been consolidated with the appeal by Central Delta, wherein which we consider both these claims. Therefore, the issue is moot.

---

[7] The appellants in case No. C078249 filed a petition for writ of supersedeas in this court seeking an order imposing a stay on the trial court's proceedings regarding whether DWR complied with the trial court's writ of mandate issued in that case. The stay sought would also have impacted this appeal. We denied the petition.

## B.      Revised EIR's Failure to Analyze Crop Conversion

Food Safety contends DWR failed to adequately address the impacts caused by the transfer of the Kern Water Bank, in terms of both (1) the relationship between the transfer and an increase in the planting of permanent crops and (2) the impact of this crop conversion on water supply and reliability.  According to Food Safety, the Revised EIR's conclusion that the Kern Water Bank transfer did not cause crop conversion in the water bank service area is not supported by substantial evidence, nor is the report's analysis of the impacts to regional and statewide water supplies caused by crop conversion.

The Monterey Plus EIR discussed the Monterey Plus project's potential to contribute to the frequency of farmers switching from annual crops such as cotton or alfalfa to permanent crops such as nuts, vines, and citrus.  The Revised EIR found the genesis of the conversion began in the 1980s and continued through the 2000s.  DWR stated, based on current trends, more farmers in the SWP service area would replace annual crops with permanent crops.

The Revised EIR continued with its analysis of the conversion phenomenon. From 1996 through 2014 the total number of acres in crop production grew by 1.2 percent in Kern County and by 3.7 percent in the Kern Water Bank Authority member's service area.  The number of acres devoted to permanent crops in both locations increased between 54 and 239 percent, and the number of acres of annual crops decreased between 39 and 89 percent.  The Revised EIR found that in the Kern Water Bank Authority member's service area about 110,000 more acres of nuts, citrus, and fruit trees were in cultivation in 2015 as compared to 1995.

In addition, the Revised EIR noted this trend in crop conversion in the service area was consistent with changes in the rest of Kern County, which experienced planting of 275,000 more acres of nuts, citrus, and fruit in 2014 as compared to 1996.  The Revised EIR provided graphs underscoring the growth in almond acreage in all of the San Joaquin

49

Valley. DWR concluded the trend toward permanent crops would likely continue in the future.

The Monterey Plus EIR also analyzed the potential causes of the ongoing crop conversion trend. The Monterey Plus project increased the reliability of SWP contractors' access to water, which potentially increased the frequency of crop conversion. The deletion of article 18's urban preference provision in times of shortage increased the reliability of water deliveries.

The Revised EIR further continued this analysis of the causes of crop conversion, noting this phenomenon was taking place statewide. Two factors appeared responsible for the shift from annual to permanent crops. First, the conversion was in response to an increase in profitability of permanent crops. Second, state water policies encouraged increased irrigation efficiency, requiring more investment by farmers in their infrastructure. Efficiency required famers to move from less expensive, less efficient flood and furrow irrigation to more expensive and efficient micro drip irrigation. The increased irrigation costs create an incentive for farmers to grow more lucrative crops.

The Revised EIR determined the trend towards permanent crops was not confined to land within the Kern Water Bank Authority member's service area, but stretched throughout California's agricultural areas. In addition, DWR observed that in dry years when surface water is reduced, there is an increase in groundwater pumping. Groundwater pumping is independent of the Kern Water Bank. The DWR concluded that crop conversion would occur with or without the existence of the Kern Water Bank.

In the trial court, Food Safety argued the Revised EIR failed to adequately analyze the environmental impact of the Kern Water Bank's facilitation of crop conversion. Food Safety asserted a clear causal relationship existed between the transfer, use, and operation of the water bank and the massive increase in permanent crops in the service areas. The conversion to permanent crops impacts state water supplies by replacing annual crops

that could be fallowed with crops dependent on a constant supply of water. Food Safety referred to the environmental impact as a hardening of demand for SWP water.

DWR countered that the Revised EIR adequately addressed the causes of crop conversion and its potential environmental impacts. DWR argued substantial evidence in the record supports the Revised EIR's findings that, while the Kern Water Bank could contribute to crop conversion, it would not result in significant environmental impacts.

The trial court reviewed the record and found the Revised EIR adequately addressed the reality of crop conversion, its causes, and potential impact on the environment. The court found Food Safety's claims that the Revised EIR " 'goes to great lengths' " to dispute any connection between the water bank and crop conversion "an exaggeration." The Revised EIR concluded the Kern Water Bank is not the primary cause of crop conversion, a conclusion the court determined was supported by substantial evidence.

The evidence before the trial court revealed the primary forces behind crop conversion were and are the higher commodity price of permanent crops as compared to annual crops, making them more valuable to growers, and the need for growers to plant more valuable crops to cover the costs of implementing more efficient irrigation systems. This trend toward permanent crops was not new nor unique to the area served by the Kern Water Bank. The trend developed decades ago and spread throughout California.

Food Safety found fault with the Revised EIR for determining the Kern Water Bank had no significant impact on crop conversion within the area it serviced. The Revised EIR suggested that since alternative sources of water were available within the Kern Water Bank service area, crop conversion would have occurred even without the development of the water bank. Food Safety challenged the evidence cited by the Revised EIR, a map of groundwater wells, arguing the evidence did not show alternative groundwater supplies were available. Instead, Food Safety cited evidence that the west

51

side of the San Joaquin Valley lacks sufficient groundwater resources and that the Kern Water Bank made planting permanent crops possible.

In response, DWR argued that farmers on the west side of the valley who lacked sufficient groundwater resources on their own property could use other Kern region water bank projects to store SWP water deliveries. A study in the 2010 Monterey Plus EIR and incorporated in the Revised EIR, Appendix E, showed that from 1995 through 2004, SWP water deliveries to Kern Water Bank members could have been stored in other water banking projects. The Revised EIR did not update the study, because 1995 through 2004 was a particularly wet period making it likely there would be adequate storage during a drier period.

Food Safety objected that there was no evidence all Kern Water Bank members had access to other water bank facilities. DWR responded that the study revealed the opportunity to store SWP water delivered to the Kern Water Bank was possible in other water bank projects, and therefore Kern County Water Agency members, as a whole, could have used the water even if individual Kern Water Bank participants could not. The trial court found this argument supported by substantial evidence.

The Revised EIR determined that, even if crop conversion would take place without the Kern Water Bank, the facility could contribute to crop conversion by increasing available water supply in the service area. Implementation of the Kern Water Bank in combination with other water projects could result in the conversion of annual crops to permanent crops. The Revised EIR analyzed and discussed the potential environmental impacts of crop conversion. DWR concluded that crop conversion in and of itself did not pose a potentially significant environmental impact.

The trial court agreed. The court reasoned that CEQA defines a significant environmental impact as a "substantial, or potentially substantial, adverse change in the environment." (Pub. Resources Code, § 21068.) CEQA defines environment as "the physical conditions which exist within the area which will be affected by a proposed

52

project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (Pub. Resources Code, § 21060.5.) Therefore, a shift from one type of agricultural crop to another does not, by itself, represent a substantial change in the environment. Instead, the court must consider whether crop conversion causes a substantial, or potentially substantial, adverse environmental change.

The Revised EIR analyzed the potential cumulative environmental impact of shifting from annual to permanent crops, guided by CEQA's checklist of environmental factors. These factors include terrestrial biological resources, visual resources, agricultural resources, air quality, soil erosion, land use, noise, cultural and paleontological resources, and traffic. (Pub. Resources Code, § 21083; Cal. Code Regs., tit. 14, Appendix G.) DWR found potential environmental impacts of crop conversion both positive and negative, but less than significant.

In challenging the Revised EIR, Food Safety underscored the potential impact of " 'hardening of demand,' " arguing the shift to permanent crops has hardened demand for SWP water supplies. This hardened demand results in less flexibility for cutbacks during droughts. The trial court found DWR correctly pointed out that hardening of demand is not an environmental impact.

The court also noted Food Safety's argument reflected a concern that the shift to permanent crops will lead to more SWP water being pumped from the Delta. Food Safety characterized this as a " 'straw-man argument.' " However, Food Safety itself referred to the issue as a hardening of the demand for SWP and Delta water and Delta water pumping. Therefore, DWR's focus on the potential impacts of crop conversion on Delta water was correct.

The Revised EIR found that the Kern Water Bank would not result in an increase in Delta water exports because SWP contractors would have requested the same amount of water with or without the Kern Water Bank. The trial court agreed, noting the evidence showed that since the 1980s the SWP has been supply-limited not demand-

53

limited. The court concluded: "Thus, there is no reason to expect that SWP contractors would have requested less water if there was no Kern Water Bank. Further . . . the Revised EIR concludes that even if the Kern Water Bank did not exist, all SWP water delivered to the Kern Water Bank by KCWA [Kern County Water Agency] members could have been delivered and stored in other locations. Thus, there is evidence to support DWR's finding that the existence of the Kern Water Bank places no additional 'pressure' on Delta resources."[8]

On appeal, Food Safety renews its claims of a lack of substantial evidence to support the Revised EIR's finding on the environmental impacts of the Kern Water Bank on crop conversion. According to Food Safety, the transfer, use, and operation of the Kern Water Bank facilitated massive crop conversion in the Kern Water Bank Authority member's service area. Food Safety cites the growth of permanent crops in the service area and argues the Revised EIR fails to "disprove that the water stored in the Kern Water Bank was used to water new permanent new crops that were planted after the Kern Water Bank transfer. It even fails to disprove that the Kern Water Bank transfer did not cause the planting of most or all of the permanent crops in the [Kern Water Bank Authority] member's service areas."

We reiterate the scope of our review of an environmental impact report. We review the adequacy of the Revised EIR for substantial evidence. (*City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 898.) " 'The court does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document.' " (*Laurel Heights Improvement Assn. v.*

---

[8] The court also noted the Monterey Plus EIR evaluated whether the Monterey Amendment project, including the SWP deliveries to the Kern Water Bank, could impact the Delta. The Monterey Plus EIR concluded that any possible impacts would be reduced to less than significant levels with mitigation. The Revised EIR did not include any new information challenging this conclusion.

*Regents of the University of California* (1988) 47 Cal.3d 376, 392.) We focus on the environmental impact report's adequacy, completeness, and good faith effort at full disclosure. (*Association of Irritated Residents v. County of Madera, supra*, 107 Cal.App.4th at p. 1390.) We may not set aside an agency's approval of an environmental impact report on the ground that an opposite conclusion would have been equally or more reasonable. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573-574.) An agency's decision to certify an environmental impact report is presumed correct, and the party challenging the certification bears the burden of proving otherwise. (*Sierra Club, supra*, 163 Cal.App.4th at p. 530.)

Here, the trial court carefully considered the record in response to each of Food Safety's contentions that the Revised EIR's conclusion on crop conversion was not supported by substantial evidence. In each instance, the court set forth the evidence in the record and found it to be substantial evidence supporting DWR's findings in response to Food Safety's claims.

On appeal, Food Safety renews arguments made in the trial court and highlights other evidence in the record calling into question the Revised EIR's conclusion. Food Safety argues the Revised EIR improperly denies that the transfer of the Kern Water Bank caused the large-scale conversion of crops. However, as the trial court noted, the Revised EIR recognized that implementation of the Kern Water Bank, in conjunction with other water projects, could potentially result in the conversion to permanent crops. Accordingly, the Revised EIR analyzed and discussed the potential environmental impacts of crop conversion.

Food Safety again disputes DWR's finding that groundwater used as alternative sources of water could be responsible for the planting of permanent crops. Food Safety maintains it established the lack of alternative water available to Kern Water Bank member agencies by providing evidence the west side of the San Joaquin Valley lacks reliable ground water resources and by demonstrating that the only evidence provided by

DWR, Appendix E of the Monterey Plus EIR, was rejected by the court in the Monterey Plus EIR litigation as improperly limited in time.

However, Appendix E was not the only evidence cited in the Revised EIR. The Revised EIR noted that west side farmers have access to SWP contractors who supply them with SWP water or with water stored in local groundwater banks. The majority of the 2.3 million acre-feet of groundwater banked in Kern County between 1995 and 2000 was unrelated to the Monterey Amendment. Farmers on the west side have access to local groundwater and excess groundwater stored in other water projects. In addition, many farmers had converted to permanent crops prior to the Monterey Amendment and the Kern Water Bank.

As for Appendix E, Food Safety argues it "should have been updated to analyze post-2004 conditions as well as post-2004 use and operation of the Kern Water Bank." Appendix E of the Monterey Plus EIR incorporated into the Revised EIR, showed that from 1995 through 2004, SWP water deliveries to Kern Water Bank participants could have been stored in other water banking projects. In preparing the Revised EIR, DWR determined an update was not required because 1995 through 2004 was a particularly wet period "making it even more likely there would have be adequate storage during a drier period."

In short, Food Safety and the DWR disagree over whether the study in Appendix E should have been updated. However, in determining whether substantial evidence supports the agency's approval of an environmental impact report, we may not set aside the agency's approval on the ground that an opposite conclusion would have been equally or more reasonable. If there are conflicts in the evidence, they are resolved in favor of the agency. (*Town of Atherton v. California High-Speed Rail Authority* (2014) 228 Cal.App.4th 314, 350-351; *Mount Shasta Bioregional Ecology Center v. County of Siskiyou* (2012) 210 Cal.App.4th 184, 195.)

Finally, Food Safety again contends the Revised EIR fails to adequately analyze the increased pressure year after year on regional water supplies, i.e., the "hardening" of demand for SWP water. However, the Revised EIR determined the Kern Water Bank will not cause an increase in water pumped from the Delta because SWP contractors would have requested the same amount of water with or without the Kern Water Bank. As the trial court noted, the evidence shows that since the 1980s the SWP has been supply-limited, not demand-limited. Therefore, "there is no reason to expect that SWP contractors would have requested less water if there was no Kern Water Bank."

Substantial evidence supports the Revised EIR's finding that, although the Kern Water Bank increased the water supply reliability in the area it serviced, the environmental impact of the Kern Water Bank on crop conversion was less than significant.

## DISPOSITION

We affirm the judgment in *Central Delta Water Agency et al. v. Department of Water Resources*, case No. C078249, including the judgment against cross-appellants Kern Water Bank Authority, et al., and the judgment in *Center for Food Safety et al. v. Department of Water Resources*, case No. C086215. We affirm the trial court's order denying attorney fees in *Center for Biological Diversity v. Department of Water Resources*, case No. C080572. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

                                                   /s/

RAYE, P. J.

We concur:

     /s/

BLEASE, J.

     /s/

HOCH, J.